# EXHIBIT C

# THE CAMPBELL FIRM PLLC

349 Fifth Avenue, New York, New York 10016
P: 212.267.3600; F: 212.267.3601
www.campbellfirm.com

Emily Campbell, Esq.
**Managing Member**
Cell:  646.734.0042
ecampbell@campbellfirm.com

November 28, 2018

**BY EMAIL**
Mr. Mitchell Raab
Olshan Frome Wolosky LLP
1325 Avenue of the Americas
New York, NY 10019

Re:  **Carbonyx Inc.**

Dear Mr. Raab:

      The Campbell Firm PLLC (the "Firm") represents Carbonyx Inc. ("Carbonyx" or the "Company").  On behalf of Carbonyx, I am writing in response to your October 31, 2018 "Notice of Defaults and Demand to Carbonyx Inc." (the "Demand"), wherein you made several claims on behalf of your clients Frank Rango ("Frank"), Bhavna Patel ("Bhavna"),[1] Harmir Realty Co. LP ("Harmir Realty"), River Partners 2012—CBX LLC ("River Partners" and together with "Frank" and "Harmir Realty", the "Preferred Shareholder Group")[2] and Carbonyx License & Lease LLC ("CL&L").[3]

---

[1] During our call last week, I asked you whether you represented Bhavna individually only or whether you also represented the Estate of Mukesh Patel (the "Estate").  You indicated that you did not represent the Estate in any respect – only Bhavna individually.  When you identified that your client is Bhavna and not the Estate, it was unclear whether you mean in her capacity as one of the beneficiaries of the Estate or solely in her capacity as the surviving spouse for a limited number of the common shares that were titled jointly with Mukesh Patel ("Mukesh"), her late husband.  Carbonyx respectfully requests clarification as to which matters you are representing Bhavna.  If Bhavna has inherited the Preferred Shares (defined below) that were held by Mukesh individually and which were retitled at the request of Hiten Patel ("Hiten"), the Estate's Executor, into the "Estate of Mukesh Patel," Carbonyx has not been notified of this, nor has it received any request to retitle the shares into any particular inheriting party's name.  Indeed, given Mukesh's wealth, Carbonyx has been under the impression that distributions from the Estate may take some time, and that at an appropriate time, it would be notified how to retitle the Preferred Shares that Mukesh held individually, whether to a trust or to a particular person or to a charity or other entity.  Carbonyx reserves all of its rights concerning Bhavna's claims to any share ownership or other claims (including the claim made regarding a purported "Second Loan" as discussed further below), ███████████████████████████████████████████████████████████████████████████
███████████████and otherwise.  Carbonyx awaits satisfactory proof that Bhavna has so inherited the Preferred Shares and has any rights concerning C6 Ardmore Ventures, LLC ("C6 Entity") discussed further below.

[2] If Bhavna did, in fact, inherit the Preferred Shares, she would also be a member of the Preferred Shareholder Group, so reference to that Preferred Shareholder Group is deemed to include her, pending satisfactory evidence being presented to Carbonyx that she inherited Mukesh's Preferred Shares.

[3] You have indicated that you represent CL&L.  Carbonyx requests some proof of authority to represent CL&L because it has received no notice of anyone purporting to act on CL&L's behalf for receiving correspondence, notices, etc., since the death of Mukesh.  Mukesh was the person Carbonyx understood was the sole owner of CL&L and was the only person Carbonyx communicated with regarding the business matters involving CL&L.  Hiten did not indicate that the ownership of the shares of CL&L were being transferred to Bhavna or anyone else, and if there were monies due and owing to CL&L, Carbonyx would have contacted Hiten, as the Executor of the Estate, to find out where any checks would be sent, based on the Company's belief

Mr. Mitchell Raab
Olshan Frome Wolosky LLP
November 28, 2018

From the tone of your letter, it appears that there is a pre-litigation posture being taken by your clients, as indeed, retaining your firm, which has a reputation for shareholder activism, can be viewed as them taking an aggressive posture.  While naturally my client will defend itself if litigation is brought by your clients, Carbonyx wants to move this discussion toward a corporate solution, rather than a litigation free-for-all.  Indeed, an offer made on or about March 28, 2018, by Frank on behalf of the Preferred Shareholder Group, which will be discussed further below, suggests that some or all of your clients' intentions are to cut a new deal, which they will find more financially agreeable in order to avoid the long-term holding risks associated with the ownership of the Preferred Shares and/or the waiting-game of when any royalties will be generated under a royalty agreement signed by CL&L, which will also be discussed further below.  To the extent my client engages in any discussions concerning any new deal, my client does so without waiver of any of its rights under any of the applicable agreements, Delaware corporate law or other applicable law or otherwise.

Because it appears that you are operating under a partial-picture of the Company's situation and appear to have been misinformed by your clients of key facts that have led you to approach the matter with an eye toward litigation, it may be helpful to provide some background about the Company and to walk you through some of the key transactions upon which your Demand appears to be based.  We approach it in this manner because to try to address the Demand in the way that it was constructed, as a line-for-line response would waste time and put Carbonyx in the position of having to respond to a litany of requests for documents and information as if it were responding to interrogatories and document requests in litigation, which is premature.

If there was litigation pending, your clients would have to submit formal document requests and my client would be producing formal objections and technically drafted written responses.  It is premature to start responding in such a hyper-technical way.  My client does not want to waste its resources, and my client does not want to cause your clients to incur unnecessary expenses in reviewing and digesting historical materials that provide little insight into the new direction the Company is moving and are superfluous given the facts which were well known by Mukesh and have been made known to Frank, who took over the role of being the representative of the Preferred Shareholder Group following Mukesh's passing.  Certainly, my client does not want to pay for your firm to review such materials.  Accordingly, my client reserves all of its rights in respect of the request for legal fees and other expenses associated with the requests made by your clients, and by this response, my client seeks to move the conversation away from threats of litigation and into more productive avenues, given the goals and plans of the Company and the opportunity for your clients to benefit financially from the Company's business opportunities, which will be hampered, if one or more of these alleged defaults leads to litigation.  In other words, my client hopes to facilitate a win-win situation for all parties.

**The Founders' License and Development of Cokonyx**

Dr. Siddhartha Gaur ("Sid") formed Carbonyx in 2000 and had a close working and personal relationship with the late Mukesh from 2004 to 2017.  Mukesh was devoted to the mission of Carbonyx and was committed to changing the way that the steel industry operated through the development of

---

that the shares of CL&L remain in the Estate until distributed and the Company is otherwise notified of the change in contact person and any address change for CL&L. If the membership units of CL&L remain in the Estate and are awaiting distribution, unless the Estate has engaged you, which, I believe, you indicated on our call last week that it had not, you are not authorized to represent that entity, and thus, any requests made on its functional behalf in the Demand are without any basis.  The Company reserves all of its rights concerning CL&L (whether owned by Bhavna or any other person or entity) to the extent the CL&L matters are discussed in this letter or otherwise, pending satisfactory proof that your firm has the authority to represent CL&L.

Carbonyx's cutting edge technology surrounding "Cokonyx", a patented process for producing synthetic coke, which is better for the environment and makes the production of steel more efficient for the steel industry.[4]

Sid was a member of the faculty at the prestigious Colorado School of Mines and is a recognized leader in this field. Together with his wife, Vibha who is also an accomplished scientist, they developed this coke-alchemy and are the owners of multiple patents that have been exclusively licensed to Carbonyx pursuant to a certain Intellectual Property License dated as of September 14, 2005 (the "Founders' License").



The best chance the common shareholders and Preferred Shareholders (as defined herein) have to maximize the value of their investments and that CL&L has pursuant to the Royalty Stream Purchase Agreement (as defined below) is to allow the Company to continue to operate as a going concern. A copy of the Founders' License will be provided for your information ▮▮▮▮▮ when your firm has provided the appropriate evidence that you are authorized to represent CL&L and subject to any confidentiality and "Chinese Wall" issues as shall be discussed further below in this letter.

The R&D process and proof of concept phases of the development of the technology, including design of facilities, equipment and processing protocols, have taken years, and have attracted the attention of major steel players. In addition, in the U.S., Carbonyx has met with much enthusiasm by states looking to create jobs for its citizens. Most notably, in the U.S., Carbonyx has gained traction in West Virginia, Oklahoma and Texas. Abroad, the Company has had opportunities with India and has most recently been in discussions with ▮▮▮▮▮ indeed, ▮▮▮▮▮

---

[4] Bhavna was well-aware of Mukesh's commitment to Carbonyx's mission; indeed, Mukesh devoted substantial time to Carbonyx that took him away from his family, as he visited the Texas office many times and stayed with the Gaur family when he was in town for more than a day trip. Mukesh and Bhava had shared time with Sid and his wife, Dr. Vibha Bansal ("Vibha"). Because of the close friendship between Sid and Mukesh, which Sid considered to be more of a familial relationship, Sid is severely disappointed that Bhavna did not simply call him to discuss any concerns she might have concerning the viability of Carbonyx and her interest in the Company. To be served with a lawyer's Demand, after all that he and Mukesh have gone through to build the Company was, quite frankly, shocking to Sid.

**The Leveraging of Royalty Agreements to Fund Company Operations**

In 2008, Carbonyx entered into two license agreements with key players in the steel industry solidifying Carbonyx as an international player in the field.  First, ▄▄▄▄▄ entered into a License Agreement with Carbonyx dated ▄▄▄▄▄ (the ▄▄▄▄▄ License").  Second, ▄▄▄▄▄ entered into a License Agreement dated ▄▄▄▄▄ the ▄▄▄▄▄ License" and together with the ▄▄▄▄▄ License, the "Royalty Licenses").

Mukesh provided and organized significant capital to help build Carbonyx over the years.  Among other business decisions he made when he was alive, he established CL&L as one means to fund the development and operations of Carbonyx, using the Royalty Licenses as a means of rewarding his financial commitment and vision for the Company.  Mukesh, through the entity CL&L, entered into the Second Amended and Restated Royalty Stream Purchase Agreement by and between Carbonyx Inc. and Carbonyx License & Lease LLC dated as of July 20, 2012 (the "Royalty Stream Purchase Agreement"), ▄▄▄▄▄

Royalties (as defined in the Royalty Stream Purchase Agreement) ▄▄▄▄▄

Importantly, ▄▄▄▄▄ It is the misunderstanding of the role and functionality of the facility located in Ardmore, Oklahoma (the "Ardmore Facility") that is presumably leading to the inquiries in the Demand concerning so-called royalties from the Ardmore Facility. ▄▄▄▄▄

The heart of the Demand in respect of Section 6.6 of the Royalty Stream Purchase Agreement h▄ ▄▄▄▄▄  As previously stated, ▄▄▄▄▄ The Ardmore Facility was first operated as a proof of concept plant, and then it was redesigned so that it could produce efficiently, as a free-standing, going concern, Cokonyx that it could sell to any steel manufacturer, including, but not limited to, ▄▄▄▄▄

Mukesh had visited the Ardmore Facility more than twenty times over the years.  Interestingly, Frank has also visited the Ardmore Facility twice – most recently in August 2018.   CL&L I, therefore,

imputed to have a working knowledge of the Ardmore Facility, at least through Mukesh, and also possibly through Frank, if he has any designation as a representative of CL&L, whether at the direction of Bhavna, if she inherited Mukesh's interest in CL&L or at the direction of any other person acting on behalf of CL&L. (*See* Footnotes 1, 2 and 3.)

Without waiver of my client's rights, my client will be pleased to offer a tour of the Ardmore Facility to the appropriate designee of CL&L once identified so that the CL&L representative can make a visual inspection of the current state of the facility ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But significantly, none of this changes the fact that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and my client is not prepared to pay for the legal fees associated with this request. Notably, this is a request that could have been made by CL&L at any time and never was prior to your Demand; to make it subject to legal fees simply because the request is being made by your firm truly bastardizes the intent of the possible covered costs provisions of the Royalty Stream Purchase Agreement.

**▮▮▮▮▮▮▮▮ Have Been Paid By ▮▮▮▮▮▮ or ▮▮▮▮▮▮▮ to Carbonyx Under the Royalty Agreements**

If there ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ they would have been handled through the ▮▮▮▮▮▮▮▮▮▮▮ (as defined in the Royalty Stream Purchase Agreement). To date ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ and CL&L had full knowledge of this fact and the fact that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Mukesh, in his capacity, as the owner of CL&L, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ For Olshan's edification, I direct your attention to articles about plant closures at ▮▮▮▮▮▮ and the "blood bath" that ▮▮▮▮▮▮ was involved with that are publicly searchable in search engines like Google and which you and your clients could have accessed for free, as well as excerpts from relevant 10Ks filed with the U.S. Securities & Exchange Commission (the "SEC"), showing that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Several articles and the aforementioned 10Ks are provided with this letter as a courtesy.

Mukesh was also aware that the steel industry world-wide was impacted by the downturn in the market and that the operations that ▮▮▮▮▮▮ anticipated would occur in ▮▮▮ have not come to fruition, despite the good faith efforts of the parties. Accordingly, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

My client has advised this Firm that it has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ My client has provided for the Firm's inspection portions of its tax returns for 2013 through

5

**Mr. Mitchell Raab**
**Olshan Frome Wolosky LLP**
**November 28, 2018**

2016,[5] and the Firm has been able to confirm that, ███████████████████████████████ ███████████████████ At an appropriate time, and without waiver of my client's rights, and with an understanding that such materials are to be shared with CL&L only and no other parties that you represent unless they have a separate and independent basis on which they are entitled to review them, upon some reasonable satisfaction that a "Chinese Wall" can be created within Olshan in respect of information to which CL&L, but not other parties, may be entitled, and subject to all protections for Confidential Financial Information (as defined in the Royalty Stream Purchase Agreement), my client will produce the relevant aspects of tax returns, copies of the Royalty Agreements (which were previously provided to Mukesh on behalf of CL&L) and a copy of the Founders' License, which would, ███ ███████████████████████████████████████████████████████ under the Royalty Stream Purchase Agreement (which was also previously provided to Mukesh on behalf of CL&L).[6] , Of course, this all presupposes that your firm has the authority to represent CL&L, and Carbonyx, as stated before, respectfully requests proof of your authority to represent that entity before making any disclosures to which CL&L may be entitled.

Carbonyx did not receive any reports contemplated by Section 6.3 of the Royalty Stream Purchase Agreement because ██████████████ There were ███████████ provided to CL&L because there were ████████ as Mukesh, on behalf of CL&L, was fully aware. While the Company fully understands that due to his untimely death, whomever has inherited the equity in CL&L (if Mukesh was the sole owner) or is otherwise running the entity as an equity holder or manager, wants to be able to understand what has historically happened (if he, she or it was otherwise not privy to the information that Mukesh was aware of during his lifetime on behalf of CL&L), this exercise cannot go from learning curve to fishing expedition. In any event, it is not appropriate for CL&L to seek any amount of reimbursement of Costs under the guise of "administration" or otherwise. CL&L because of Mukesh's intimate working knowledge of the finances of Carbonyx is imputed to know the facts. And the simple fact is that ███████████████████████████████████████████ To ask Carbonyx to go through any technical reporting requirements in Section 6.1 and 6.2, when CL&L had knowledge that ██████████████████████████████ is frivolous.

CL&L, through Mukesh, had reviewed unaudited financial statements and/or waived, directly or indirectly (given the written exchanges regarding the absence of audited financials and/or through course of conduct), the requirement for such statements to be provided while he was alive. If there is a technical failure to provide any since Mukesh's passing, it is just that – a technical failure. Indeed, the Company has sought to minimize expenses and has not conducted an audit. Without waiver of any rights under the Royalty Stream Purchase Agreement or otherwise, Carbonyx will provide interim unaudited financial statements of Carbonyx and its subsidiaries since Mukesh's passing, once the principals are identified that

---

[5] From a review of the tax returns, it appears that Carbonyx's ██████████████████████, so that, for example, the filing period for ████████████████.

[6] The fact that CL&L is unable to locate documents previously provided does not give rise to covered costs for legal fees by Olshan making requests for documents that CL&L could have asked Carbonyx for, without legal intervention, at any time. Carbonyx was not aware that Mukesh's papers were not organized (assuming that is the case; given the request for documents that were long ago provided to Mukesh, it presumably is the case, otherwise your firm is clearly asking for duplicates of files already in your client's possession, which is not fair or reasonable under any set of circumstances). Carbonyx has no objection to providing duplicates to the party rightfully requesting copies thereof, but it will not pay for attorneys' fees associated with such requests for copies or accountant's fees associated with doing calculations that Mukesh did (or had done by CL&L's accountants) while he was alive or any other charges that represent essentially a "do-over" for business matters completed by Mukesh during his lifetime.

were co-owners with Mukesh in CL&L or have otherwise inherited pursuant to his will and/or a representative is designated by a person or an entity authorized to act on behalf of CL&L, with complete reassurances that the information contained in such financial statements will be treated in a confidential manner as contemplated by the Royalty Stream Purchase Agreement. Please provide the information as to ownership of CL&L since Mukesh's death as requested above. Note that, if Bhavna is now the owner of CL&L, she could have simply called Sid and requested the information. She need not have sought to run up legal bills unnecessarily for Carbonyx, and under these circumstances, Carbonyx is not prepared to pay for CL&L's legal, accounting or other bills, given that it should have contacted Carbonyx directly so that historical information, if needed, could be resent to CL&L and continuing reporting could be made if and when relevant.[7]

Indeed, Section 6.1 provides that Carbonyx will deliver, or cause to be delivered to the Buyer such other financial information respecting the Royalty Agreements, the Royalty Pool, the Royalty Pool Proceeds or the financial condition of Carbonyx as the Buyer may from time to time *reasonably* request." (emphasis supplied with defined terms not otherwise identified here as defined in the Royalty Stream Purchase Agreement). Significantly, Section 6.2 allows inspection of records to verify collection activity as it pertains to the Royalty Pool and Royalties. It is not an open-ended invitation to inspect every piece of paper that Carbonyx maintains in respect of its business operations. (Note also that Carbonyx has reciprocal rights of information pursuant to Section 7.1 and 7.2 of the Royalty Stream Purchase Agreement, but because there have been no Royalties collected and no distribution into the Royalty Pool, Carbonyx has not sought to run up CL&L's legal and accounting bills unnecessarily.)

**Carbonyx Has No Responsibility for CL&L's Legal Fees For Olshan's Work Under the Royalty Stream Purchase Agreement Under These Circumstances**

While Carbonyx understands that Olshan is seeking confirmation that CL&L's out of pocket costs will be covered in connection with this inquiry, Carbonyx directs your attention to Sections 2.7 and 9.5 of the Royalty Stream Purchase Agreement. The method by which any Costs (as defined in the Royalty Stream Purchase Agreement) are to be paid is strictly from the Royalty Pool Proceeds. Unfortunately, to date, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓ The knowledge that there have been ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ is imputed to CL&L, irrespective of the fact that Mukesh has passed, and the Estate or any other owner in CL&L that may have taken over its operations, because such information was known to Mukesh at all relevant times. Running up legal and accounting bills to review financials of Carbonyx under the guise of potentially finding some hidden stream of income is imprudent, given the Company's tax reporting.

The Royalty Stream Purchase Agreement was solely drafted by CL&L, without any comment from Carbonyx at the time. Sid and Mukesh has a relationship of complete trust, and Sid signed the Royalty Stream Purchase Agreement without hesitation, knowing that Mukesh had the Company's best interests at heart. For the Company to have to spend time, effort and money responding to legal inquiries is wasteful. Bottom line: Carbonyx is not prepared at this time to simply green light an open-ended tab to pay CL&L's legal or other fees in connection with the inquiry as to Royalties; such a demand defies logic, under the circumstances, and if pursued will subject both your firm and CL&L to potential liability for Carbonyx's damages, including its attorneys' fees and costs of compliance with a pointless technical

---

[7] Please note that Frank was also advised of the ▓▓▓▓▓▓▓▓▓▓▓▓ at various times, which, to the extent Frank is purporting to act on behalf of CL&L, such knowledge would be imputed to CL&L, as well.

Mr. Mitchell Raab
**Olshan Frome Wolosky LLP**
November 28, 2018

inquiry to prove what CL&L is already imputed to know.  There simply have been ▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬ and thus ▬▬▬▬▬▬▬▬▬▬.  Further, if any other of your clients insists that, because the Royalty Stream Purchase Agreement is mentioned in the Loan Agreement (as defined below), they are entitled to this information, Mukesh and Frank, as the representatives of the Lenders (as defined below) already know that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and had, on information and belief, duly informed the other Lenders of such, so that this pole on this fishing expedition needs to come out of the water now before they, too, will find themselves on the other end of a harassment claim and other claims for damages.

What is being sought here in the laundry list of items that Olshan has requested on behalf of a group of clients that may have conflicting interests and may not be entitled to see all of the same documents is not reasonable and is actionable in its own right.  While threats of ▬▬▬▬▬ ▬▬▬▬▬ pursuant to Section 6.9 of the Royalty Stream Purchase Agreement due to so-called defaults remaining uncured do not fall on deaf ears, there have been no material defaults under the Royalty Stream Purchase Agreement, and in any event, if there had been any default, to the extent that ▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (Similarly, attempting to exercise rights in respect of the Collateral as defined in the Royalty Stream Purchase Agreement pursuant to Section 3.2 is unwarranted; if CL&L were to attempt to sue ▬▬▬▬ for instance, for not ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ it would be unsuccessful in its pursuit.  Indeed, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Accordingly, since ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Carbonyx and anyone asserting rights on its behalf would be hard-pressed to find a legal theory under which it could obtain ▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Certainly, Carbonyx hopes that ▬▬▬▬ and ▬▬▬▬▬ will resume one day and be able ▬▬▬▬▬▬▬▬▬ but to date ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

Section 6.6 of the Royalty Stream Purchase Agreement requires Carbonyx to keep and maintain all of its properties necessary or useful in its business in good condition, repair and working order, normal wear and tear excepted.  But it is critically important to be reminded that Section 6.6 also provides that Section 6.6 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬[8]

Please note also that Section 9.6 of the Royalty Stream Purchase Agreement pertaining to the indemnity is inapplicable here, as the claims being asserted here are being asserted by CL&L directly and not because it has had to answer to a third party, such as another claimant or a taxing authority.  Accordingly, any effort to get Costs under this Section 9.6 would fail if litigated because CL&L is not an Indemnitee (as defined in the Royalty Stream Purchase Agreement).  And it goes without saying that

---

[8] Monday morning quarter-backing in this context is wholly misplaced.  Mukesh was intimately familiar with what was happening in the steel industry and agreed with this strategy employed by the Company.  CL&L cannot change the past and is imputed to know what Mukesh knew and be bound by business decisions Mukesh made while he was alive.

Mr. Mitchell Raab
**Olshan Frome Wolosky LLP**
November 28, 2018

requesting further assurances pursuant to Section 9.18 under these circumstances is unreasonable, so recovery of Costs under that provision is also not meritorious.

Please note that, if CL&L proceeds with an unfounded claim, the Company will seek damages against CL&L and sanctions, as CL&L is and has been on notice that the Company has ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ Further, if it attempts to file a lawsuit without filing it under seal, given the confidential nature of the Royalty Stream Purchase Agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the Company may have further damages, and ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ may also have damages against CL&L.

**There Was No So-Called "Second Loan" Made to Carbonyx;**
**Mukesh Made an Investment on His Brother's Behalf**

In your Demand, you state that between May 13, 2016 and January 24, 2017, Mukesh made several loan payments to Carbonyx, which totaled $3.5 million. Olshan claims, on behalf of Bhavna, that, despite repeated assurances that the so-called loan would be documented, such loan-transaction has not been documented. You have advised that Bhavna is demanding repayment of this supposed loan.[9] Unfortunately, those are not the facts, and there is no loan for $3.5 million due and payable to Bhavna or any other person or entity.

Mukesh, on behalf of CL&L, was aware that the Ardmore Facility's operations ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mukesh was well aware of this, and in fact, he provided investment capital to facilitate this effort in the amount of $4.5 million, $1M of which was taken as Preferred Shares in the Company, and the remaining $3.5 million, were invested to establish a collaboration between the C6 Entity and the Ardmore Facility. Notably, Olshan does not represent Hiten in his capacity as Executor of the Estate, in connection with his ownership of the C6 Entity or otherwise, and indeed, it would be surprising if Olshan did, since Hiten has been in regular communication since Mukesh's passing and would not likely opt for this type of legal maneuver. If he had any questions or concerns, he would likely call Sid directly, not resort to what can only be described as scare tactics while Sid is grieving and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Indeed, Sid's grief is substantial, as he has lost Mukesh, who was not only an investor and staunch supporter of Carbonyx's business, including the Ardmore Facility, but also an incredibly dear person to the Gaur family.

Following the untimely passing of Mukesh, Hiten and Sid had multiple conversations about memorializing the details of this investment transaction as per Mukesh's and Carbonyx agreed terms, but which had not been fully documented yet.[10] The conversations between Sid and Hiten were progressing

---

[9] Again, you have advised the firm that you represent Bhavna individually and not the Estate. Bhavna was never involved in any discussions or transfers of monies on behalf of the C6 Entity, and on information and belief, she was not even made aware of this investment by Mukesh when he was alive as it was not meant for her benefit. She only came to know of this investment after Mukesh's untimely passing. Before any information is provided to your firm intended for Bhavna's review and/or benefit, regarding the transaction with the C6 Entity, Carbonyx respectfully requires some proof of her alleged entitlement to funds that were transferred to Carbonyx by Mukesh for the rights that, to Carbonyx's knowledge, were only to benefit the C6 Entity. Mukesh's decision to provide an investment and source of income for his brother, Hiten, who was caring for their aging mother, did not involve Bhavna in any respect during Mukesh's lifetime, as far as Carbonyx is aware, and unless there is something that entitles Bhavna to a claim to this investment now, Carbonyx respectfully declines to provide detailed information as to the terms of the C6 Entity's interest in the Ardmore Facility at this time. If it becomes relevant because of a business discussion concerning a possible new deal relating to Ardmore, as discussed below, appropriate disclosures will be made, subject to applicable confidentiality protections and only to those with a need to know.

[10] On information and belief, Bhavna's actions taken to retain your firm and to stir a pot have caused Hiten to be cautious in trying to memorialize what he knows to be rightfully his, as per Mukesh's arrangements with Carbonyx. On information and belief, Hiten does not want to be in the middle of a dispute among people he knew Mukesh loved dearly. Indeed, Hiten, in

9

in a collaborative way keeping the spirit of trust alive that was present between Mukesh and Sid until, on information and belief, Bhavna requested that Hiten put these discussions on hold and had Frank begin to make inquiries about the Ardmore Facility, purported to act on behalf of the Preferred Shareholders Group, but on information and belief, an eye toward possibly wrapping the Preferred Shares into a new deal, which is discussed further below, along with the C6 Entity's interests and other of your clients' interests. Shortly after that, Olshan served this Demand, so nothing has been memorialized for the C6 Entity's benefit yet. Carbonyx can move forward with preparing documentation or C6 Entity's attorneys can take the lead on preparing such documentation, but in no event will Carbonyx be responsible for the legal fees associated with documenting that corporate transaction.

Hence, based on your client's input, you have wrongfully classified the $3.5 million dollars as a "Second Loan" in the Demand, and it appears you may have no client that has any interest in the investment made by the C6 Entity in the Ardmore Facility. There never was an additional loan made by Mukesh to the Company in the amount of $3.5 million dollars or otherwise. Mukesh saw the benefit of investment at the Ardmore Facility so as to help his brother. This investment was through the C6 Entity and not an investment by Mukesh as an individual; Mukesh only received $1M in preferred shares individually as part of this transaction, which were retitled to the Estate and to no other person or entity, and which you have indicated you do not represent. The C6 Entity does not appear to be your client either so, unless you can provide written documentation that Bhavna or someone else you represent controls the C6 Entity, further discussions with Olshan about this matter would be inappropriate at this time.

**Frank Was Not Entitled To Purchase Common Shares Owned by** ███████
**Without Giving Notice to Carbonyx, Which Has a First Right of Refusal**

In your Demand, you advise the Company for the first time that Frank has purportedly purchased all of the shares of ███████████████████████. You stated that the supposed transaction occurred on October 15, 2018, and on Frank's behalf, you make a demand that Carbonyx record that transfer of ownership. In connection with any due diligence Frank would presumably have completed before attempting to purchase ███████ shares, he would have reviewed the Company's bylaws (the "Bylaws"), which he already had possession of, in connection with the transaction whereby any right to receive loan proceeds and the warrants under a certain Amended and Restated Loan and Warrant Issuance Agreement dated as of May 1, 2012 among Carbonyx Inc. and Each of the Lenders Party Hereto ("the Loan Agreement") were substituted for preferred shares (the "Preferred Shares") in a separate transaction that will be further discussed below. Section 6.01 of the Bylaws provides for the ███████████



---

advising Sid that Bhavna had asked him to let her address certain matters, simply said, "I am just the messenger." Hiten is grieving the loss of a dearly loved brother, who was more like a father to him following the death of their father at a young age, and he has not wanted to engage in petty inter-family disputes over who is entitled to what. That being said, Mukesh was very clear that the C6 Entity was for Hiten's benefit, with on information and belief, its Texas registration and business address being that of ███████████. Unless Hiten has relinquished his rights to the C6 Entity and given them to Bhavna, Olshan has no right to be requesting information on Bhavna's behalf regarding the C6 Entity or the details of the transaction. Upon satisfactory proof of any authority to obtain this information and subject to any Chinese Wall considerations as previously discussed pertaining to other of your clients, Carbonyx will commit to working with your firm to document, but not renegotiate, the transaction that Mukesh had put into place. Please note that, if the $3.5 million were a loan, and if Carbonyx wished to disclaim liability, the lender might inevitably be without remedy depending on which state's statute of frauds would apply to this situation; we need not address this issue here because it is most certainly not a loan in the first instance.

**Mr. Mitchell Raab**
**Olshan Frome Wolosky LLP**
**November 28, 2018**

In connection with any due diligence that Frank would presumably have conducted in connection with these securities, Frank also should have reviewed ▇▇▇ Subscription Agreement signed by ▇▇▇▇▇▇ (the "Subscription Agreement"). Frank should have known that the securities that ▇▇▇ has attempted to transfer are restricted securities and cannot be freely transferred pursuant to the Subscription Agreement.

We may separately send a letter to ▇▇▇ to inquire whether, in fact, ▇▇▇ has purported to transfer its shares to Frank and to advise ▇▇▇ that a transfer without appropriate notice is ineffective to transfer shares of the Company to any person or entity. While my client may be willing to waive this requirement, it is not prepared to do so at this time. More information is needed to know what consideration was paid for the transfer, and any opinion of counsel that may have been required in respect of SEC regulations was not so provided. At this time ▇▇▇ is still listed as the record owner on the Company's books and records. (See Sections 6.05 and 6.06 of the Bylaws.)

Your Demand further asserts that Frank is entitled to inspect Carbonyx's books and records pursuant to Section 220 of the Delaware General Corporation Law. Unfortunately, even if the Company is willing to recognize Frank as the new owner of ▇▇▇ shares, Frank ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

To the extent Frank would seek to complete a valuation of his stock, he may have certain rights pursuant to Section 7.08 of the Bylaws, which although you did not specifically call attention to it, may be relevant as it does relate to Section 220. But he has not stated that his purpose is to obtain a valuation of his stock, which may or may not be a proper purpose, and he would have to sign an appropriate confidentiality agreement. What is problematic in this instance, is that, on information and belief, Frank has ties to competitors of the Company, which my client believes has arisen following the execution of the Loan Agreement. My client has recently discovered, for example, that Frank has participated in one or more analyst calls with ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Even if Frank were to state that his purpose is to determine the value of his stock, the Company would not have to accept this pretext to discover the confidential information of the Company for the purposes of utilizing the information in an anti-competitive manner. Indeed, a valuation was done on behalf of Mukesh's Estate, as requested on or about December 17, 2017, by letter from Hiten, the Executor of the Estate at that time, through a reputable valuation firm named ▇▇▇ (the "Valuation Expert") which, if Bhavna has not supplied it to your firm should be the first source of such information. The Company fully cooperated with the research by the Valuation Expert, at the Company's own expense and did not seek reimbursement for any of its costs associated therewith. Any attempt to have the

---

[11] Moreover, Frank has not made his request for inspection in the proper form, and narrowly tailored, as required under Section 220 of the Delaware General Corporation Law, if he were eligible (which he is not), to make such a request thereunder. Consult the statute for all the technical requirements that are mandated by the State of Delaware to prevent fishing expeditions and avoid make-work and disclosures to shareholders with improper motives.

Mr. Mitchell Raab
**Olshan Frome Wolosky LLP**
**November 28, 2018**

  Company go to the expense of facilitating an additional valuation on the heels of one so recently completed would be inappropriate and subject the Company to unnecessary expense. If pursued, the Company will seek reimbursement for the costs associated with a valuation from Frank and any other of your clients seeking to affect such a new valuation at this time.

  Without waiver of the Company's rights in respect of the Subscription Agreement, Delaware law or otherwise, Carbonyx is certainly willing to make a copy of the Company's current capitalization table (the "Cap Table") available for inspection to any of your clients that have a right to review it, subject to any prerequisites concerning the maintenance of confidential information and other requirements under an applicable agreement or Delaware law, and provided that it is clear in what capacities the Cap Table would be received and provided an appropriate Chinese Wall is constructed at your firm to prevent clients of your firm without a right to know access. This would be in connection with my client's compliance pursuant to Section 219 of the Delaware General Corporation Law providing who has a right to vote the shares of the Company, it being noted that Preferred Shares carry no voting rights, as set forth in the Company's charter.

  While this Firm understands that your firm is a leader in the field of shareholder activism, this is not a case where there has been any inappropriate corporate conduct, and Carbonyx has nothing to hide. That being said my client will not permit an unbridled fishing expedition to be launched by your clients at the Company's expense (including, for example, your clients running up legal bills with your firm and then asking the Company to pay for them, including, but not limited to, for Olshan to review "all documents and communications relating to Carbonyx's past or existing agreements, arrangements and projects with [redacted] including current status thereof" (your Request Numbered "x"), when your clients were well aware of the relationship between [redacted] and Carbonyx, and the claims that have been made by Olshan on behalf of your clients are unfounded. Indeed, I am certain, given your firm's prominence in the space, that you are familiar with *Jack Wilkinson v. A. Schulman, Inc*., 2017 WL 5289553 (Del. Ch. Nov. 13, 2017). In the *Wilkinson* case, counsel for stockholder plaintiff Jack Wilkinson first sent the company a demand letter on his behalf seeking specified categories of books and records ostensibly to investigate possible breaches of fiduciary duty in connection with the decision by the company's board of directors to accelerate the vesting of shares of restricted stock worth more than $3.9 million to the company's president and CEO upon his retirement. The letter alleged that the board's decision harmed the company by causing it to lose favorable tax treatment under Section 162(m) of the Internal Revenue Code and amounted to corporate waste. After the company refused to produce documents in response to the demand, the plaintiff filed an action in the Court of Chancery. The parties engaged in discovery, during which the stockholder plaintiff was deposed.

  After a trial (on a paper record), Vice Chancellor J. Travis Laster entered judgment for the company, finding that the stockholder plaintiff failed to state a proper purpose for his demand after concluding that counsel for the stockholder (rather than the stockholder himself) had come up with the issues identified in the demand. Specifically, the stockholder testified at his deposition that the event that prompted him to pursue the demand was his unhappiness with the company's financial results—an event wholly unrelated to the compensation issues identified in the demand letter and lawsuit. Indeed, the stockholder testified that "he was not aware of any facts suggesting wrongdoing, mismanagement, or waste relating to the compensation decision…." The court took the position that Wilkinson had simply "lent his name to a lawyer-driven effort by entrepreneurial plaintiffs' counsel."

Mr. Mitchell Raab
**Olshan Frome Wolosky LLP**
November 28, 2018

A fishing expedition will not be tolerated by my client and will certainly not be paid for by my client. You should advise your clients of this fact and make sure that they are prepared to pay for not only your firm's costs, but also my clients' costs of responding to these improper demands, including, but not limited to, the legal fees incurred from my Firm's representation. Indeed, the court in *Wilkinson* did not order the company to pick up the tab for the plaintiff's unwarranted claims.

**Your Clients Substituted Their Rights to Receive Any**
**Funds Under the Loan Agreements for Preferred**
**Shares and Cannot Undo That Transaction Now**

In an effort to fund the operations of the Company with respect to the ▓▓▓▓▓ project, Carbonyx entered into various term loans pursuant to the Loan Agreement and the individual applicable promissory notes (each a "Note" as defined in the Loan Agreement and as shown in the form of Note attached as Exhibit A to the Loan Agreement). Pursuant to the Loan Agreement, the Notes could be used to pay the exercise price for the Warrants (as defined in the Loan Agreement). Some or all of the persons or entities loaning funds to the Company (each a "Lender" as defined in the Loan Agreement) could exercise their Warrants; the consent and exercise by all the Lenders (as defined in the Loan Agreement) was not required for some of them to pay the exercise price for the exercise of the Warrants and receive the common stock associated therewith. (See Section 3.03 of the Loan Agreement.)

At the time the Notes were coming due, it became clear to Mukesh and the other Lenders that the Company did not have sufficient funds to pay the Lenders the amounts that were otherwise coming due under the Loan Agreement and Notes. The principal amount due under the Notes totaled $13.225M. Mukesh, as well as Frank, who were recognized to have important functions under the Loan Agreements (see Section 7.03, for example), were heavily involved in the renegotiation of a better deal for the Lenders, whereby they would receive Preferred Shares, not simply have the Warrants be exercised for common stock.

In a footnote on page 2 of your Demand, you stated that that any conversion into Preferred Shares would have required the unanimous approval of the Lenders and that was not obtained. It is the Company's position that this transaction for Preferred Shares was not an amendment to the Loan Agreement or the Notes and was not a modification of the Agreement or the Notes or waiver of any of the provisions of the Agreement or the Notes. Accordingly, no such unanimous written consent would be required.[12] It is the Company's position that it was an entirely new transaction that substituted for and superseded the exercise of the Warrants and was completed when the Lenders accepted their stock certificates representing the number of Preferred Shares and terms of those shares, including all new warrants associated therewith. Not only did your clients not object to the issuance of such certificates, but there is substantial written evidence that they accepted the Preferred Shares and, on information and belief, they have represented the same to third parties.

---

[12]Even if it were an amendment to, modification of or waiver of any provision of the Loan Agreement and the Notes, only the Majority Lenders, would have had to provide written consent thereto, except for any of the Section 2.03, 2.04, 2.05 and 8.05 as noted in Section 8.05 or Section 7.03 in respect of Mukesh and Frank. Because Mukesh and Frank provided written consent, there is not a claim that Section 7.03 is implicated. And there was no amendment, modification or waiver of Section 2.03, 2.04, 2.05 or 8.05, as indeed, the Preferred Shareholders obtained more favorable treatment in a transaction that supplanted the Loan Agreement and Notes to get Preferred Shares not simply common shares which they would have otherwise obtained in the conversion. Alternatively, should this proceed to litigation, my client reserves the right to argue that your clients exercised their rights and obtained common shares which they then converted to preferred shares and any other legal arguments it may have to defend itself from these vexatious claims.

**Mr. Mitchell Raab**
**Olshan Frome Wolosky LLP**
**November 28, 2018**

Contrary to your assertion in that same footnote, there was no unilateral mailing of the certificates representing the Preferred Shares. Mukesh made a special trip to Texas from Connecticut on April 14, 2017, to retrieve the originals, together with all documentation including the Bylaws and distributed the same to each and every one of your clients who became, upon the acceptance of those stock certificates, the preferred shareholders (the "Preferred Shareholders"). It is simply disingenuous for any of them to claim that they do not own preferred shares and want to unwind a transaction that has not only been completed, but which has resulted, on information and belief, in the reporting thereof, to the Surrogate's Court administering the Estate, as well as the Internal Revenue Service in connection with the filing of an estate tax return for the Estate.

Notably, the Company received a written request from the Executor to retitle the Preferred Shares individually owned by Mukesh in the name of the "Estate of Mukesh Patel." It promptly did so, reissuing stock certificates reflecting that titling and delivering the same to Hiten in his capacity as Executor of the Estate.

Even if the Company had the funds to pay the Lenders back and unwind the transaction that made those Lenders the Preferred Shareholders, the Company would not be inclined to do so. What the tax consequences of undoing a previously concluded transaction or other consequences would be is unclear, and the Company has no legal obligation to undo a transaction that has been already closed for over a year or pay for your clients' costs associated with attempting to undo it, even if the Preferred Shareholders are having buyers' remorse now.[13] This is wholly illegitimate legal basis upon which to proceed and upon which to claim that their attorneys' fees should be paid. If they persist in pursuing such a strategy, they will do so at their own peril, as the Company will seek damages, including attorneys' fees, in defending against such unmeritorious claims.

Similarly, your clients are not Indemnified Parties pursuant to Section 8.04, that would require my client to pay for your clients' legal fees and other expenses in going on a wild goose chase. These Preferred Shareholders know very well that they own Preferred Shares and have had their respective certificates reflecting such ownership in their possession for well over a year. They may wish that they had the right to get the money back now, but they simply do not.

To the extent your clients are now Preferred Shareholders and no longer have the rights of Lenders under the Loan Agreements or the Notes, your clients are not entitled to ongoing financial disclosures and inspection rights pursuant to Sections 7.05 and 7.06 of the Loan Agreements. Note that Mukesh and/or Frank regularly reported to Harmir Realty and River Partners. Mukesh was well-versed in the Company's financial situation, and Frank even visited the Ardmore Facility in August 2017, after Mukesh's death, and prepared a report about the Company's status for the Preferred Shareholder Group – a role that he took on that had previously belonged to Mukesh. Your clients can provide that report to you, if you have not seen it; it certainly would be unwarranted to ask the Company to pay for your review of such a document that all of your clients possess and that they could easily have provided to you. Indeed, when you review it, you will understand why the Company is confident and secure in its position that the transaction to substitute the Preferred Shares for the entitlement to receive monies under the Loan

---

[13] As a reminder, if your clients are considering ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ whether as a result of any alleged Event of Default (as those terms are defined in the Loan Agreement), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Agreement and Notes and any common stock in connection therewith was signed, sealed, delivered and accepted by Mukesh and your other clients that are claiming rights under the now superseded Loan Agreement. Importantly, Frank noted the ownership specifically in the report to the Preferred Shareholder Group, and not a single Lender cried foul, as each of them had their new stock certificates in hand and were satisfied with the better deal that they received than they would have had the conversion been simply to common stock. Indeed, they were issued additional warrants to boot.

The simple fact is that your clients' rights as Lenders have not continued, and they are well aware of it. The Company maintains email and handwritten evidence unequivocally demonstrating that the Preferred Shareholders' Group (and Mukesh – including through his Estate) acknowledged ownership of the Preferred Shares. Your clients should be able to provide this proof to you from their own records, and Carbonyx respectfully submits that Olshan should challenge them to do so. Indeed, if you plan to put forward a verified complaint, further diligence should be undertaken by Olshan so it does not create sanctionable conduct by going down a Rabbit Hole. After a more thorough review, Carbonyx is confident that Olshan will not be comfortable pursuing claims specific to the Loan Agreement on behalf of those claiming to still be Lenders. Of course, given that you have been advised of your clients' admissions regarding the Preferred Shares and the actions of the Estate with respect to Mukesh's individually held Preferred Shares, if you do bring claims on behalf of the persons claiming rights as Lenders under the Loan Agreement, my client may authorize this Firm to pursue sanctions against Olshan, as you have been advised that these claims are wholly without merit.

To require the Company to provide information pertaining to prior periods that has already been provided is duplicative and burdensome and is a form of harassment, which will not be tolerated. If your clients persist in this argument, my client will sue them for bad faith and harassment and obtain damages and recoup legal fees and expenses associated with responding to such non-sensical claims.

**The Founders and Other Employees Have Been Taking Nominal
Salaries While the Company Has Been Operating on a Reduced Scale**

My client has asked me to address one of the more offensive requests in the list of requests in your Demand, and that is your request to identify any payments or $5,000 or more by Carbonyx or any subsidiary of Carbonyx to any of Carbonyx's or Carbonyx's subsidiaries, officers, director, shareholders or to any affiliates or parties related to, any of the foregoing after the date of the Loan Agreement. A foul smell rises from the pile of such a request, as it suggests that Sid or others are benefitting at the expense of CL&L or the Preferred Shareholders' interests (or the Lenders' interests prior to them becoming the Preferred Shareholders). [redacted]

As otherwise set forth in this letter, when and if all or relevant excerpts from tax returns are produced, they will reveal that [redacted] At no time has the Company [redacted].

**Potential New Deal**

15

Mr. Mitchell Raab
**Olshan Frome Wolosky LLP**
November 28, 2018

In March 2018, Frank voluntarily visited Carbonyx's office in Texas and unilaterally proposed a new deal to the Company on behalf of and in his capacity as a member of this Preferred Shareholder Group. Frank apparently wanted to leverage the Preferred Shareholder Group's interests (and purporting to speak on behalf of Bhavna, who may or may not be a member of the Preferred Shareholder Group), by leveraging their preferred shares to trade-up ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Importantly, Frank left behind for Sid to consider. a hand-written note memorializing this offer, and on information and belief, he maintained a copy, which he could provide to you directly; you certainly do not need Carbonyx to pay for and produce documents already in the possession of your clients, including Frank.

Without waiver of my client's rights in respect of the disclosure of financial projections and identification of capital needs, my client may provide information about its prospects and plans and additional information consistent with your requests in the context of the discussion of an alternative deal structure that would address not only the Preferred Shareholders' interests, but all of your clients' interests, as well as interests of the C6 Entity and the interests of any person or entity who will receive their interests when distributions from the Estate are completed. All of this, however, is to be made subject to an appropriate confidentiality agreement that will need to be prepared and entered into by the parties in connection with a term sheet. Of course, my client will not pay for the legal fees of those participating in such a transaction, as indeed, each party in such deals is ordinarily responsible for his, her or its own legal fees.

**Arranging a Meeting between Your Clients and the Company**

My client fully expects that you will provide this letter to your clients in its entirety and will not solely summarize it for your clients. Indeed, it is important that they be advised of the risks of pursuing unfounded claims and requesting information to which they are not entitled.

As I said before, my client is not taking the line-for-line approach of indicating which of the documents and information it will or will not provide in response to your lengthy, overburdensome and highly invasive list of requests. You should take the opportunity to review the list with your clients, in light of the explanations provided here, and narrow the list accordingly. My client can then review the revised requests and determine to what extent it is required to produce for some or all of your clients' inspection, documents and information. To attempt to respond to what is akin to a formal discovery request in the absence of litigation would be imprudent, and much of the information requested will never be produced for inspection because it is objectionable as already in your clients' possession, unduly burdensome, not properly discoverable by any one of your particular clients (once again highlighting the potential for your firm to have real and perhaps insurmountable conflicts of interests between and among clients) and other valid legal reasons, all of which are reserved by Carbonyx. Without waiver of my client's rights concerning this list you have included in your Demand, my client represents to you that there is currently no litigation, defaults, claims or regulatory action with respect to Carbonyx and each of its subsidiaries that would meaningfully impact your clients' rights as Preferred Shareholders or in respect of the Royalty Stream Purchase Agreement, so your clients can rest assure that the Company is ▇▇▇▇▇

---

[14] It was well-known by the Preferred Shareholders that Mukesh planned to invest additional funds into the Ardmore Facility operations; the terms under which such additional funds would be received had yet to be worked out. Frank knows ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ but in his proposal, he stated that the Preferred Shareholders would not necessarily agree to put in further cash for a deal whereby the Preferred Shares would be retired in favor of economic rights in the Ardmore Facility. Such a deal held no appeal at the time for Carbonyx, and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ it still does not.

**Mr. Mitchell Raab**
**Olshan Frome Wolosky LLP**
**November 28, 2018**

███████████████████

If after your clients have reviewed Carbonyx's explanations, they still have questions, we can arrange for a meeting at a mutually convenient time in December, at the Company's offices in Texas, or at Olshan's or my Firm's offices, in order to discuss matters further, but if Olshan's clients persist in making unfounded allegations and attempting to use any so-called technical rights under applicable documents to try to push the Company to renegotiate terms of agreements and deals that have already been completed, Carbonyx will seek damages against them for wasting the Company's resources. Indeed, if your clients, even in under the guise of breach of contract claims, essentially bring misappropriation claims or, if your clients bring claims in bad faith, they will be liable for the Company's costs.

Other than as stated in this letter, my client is not prepared to produce for inspection any documents at this time, and to the extent that any documents identified in this letter that are not otherwise provided with this letter are to be produced, they will be produced at the offices of Carbonyx located in Allen, Texas. Please note the Company's address is: 645 South Custer Road, Allen TX 75013, not as provided in your letter.

As you and I discussed last week, the goal is to work toward a confidentiality agreement over the next few days so that we can try to get some additional documents provided to you, if possible, by December 7, 2018. This is an ideal goal, but I am aware that it may take some time for your firm and your clients to digest the information provided in this response. I am also mindful of the holiday month and the inevitable end of year issues that always arise with corporate operations.

In conjunction with the goal to provide relevant information to appropriate parties, we will need the confirmation of authority for your firm to represent the particular parties that we have identified above and proof of rights in and to the shares and/or agreements and/or rights of such persons or entities as identified above so we can make sure that we understand to whom documentation is being provided and who will be signing an appropriate confidentiality agreement. We also request assurances of how the Chinese Wall will be handled in your firm and what other lawyers will be involved so that we may communicate with them appropriately.

I am flying to Texas next Thursday for meetings at the Company's offices and to review documentation that the Company was not wholly comfortable digitizing or which would be burdensome for it to digitize. I am doing that so as to be better prepared for the follow-up conference call among some or all of the parties and one or more in-person meetings that can take place in New York or Texas as may be determined by the parties in cooperation with the purpose and nature of the meeting. For example, if your clients want to tour the Ardmore Facility, we would need to meet in Texas. To the extent, your clients want to review certain documents, subject to all the caveats discussed above, that should also be done at the Company's headquarters in Texas.

You had said that a follow-up call and/or meeting would only be as valuable as what this response bears. I believe your clients will find reason to want to meet with representatives of Carbonyx, as to pursue litigation as a strategy to ultimately try to effectuate the same deal that they are being invited to work toward now would be ill-advised, and they are all shrewd business professionals and know what is in their own best interests. I respectfully submit that it is for everyone's mutual benefit to follow-up

**Mr. Mitchell Raab**
**Olshan Frome Wolosky LLP**
**November 28, 2018**

with calls and/or meetings and not pursue a litigation path, but of course, if that is what happens, my client is prepared for that possibility, too.

My client specifically did not want a "for settlement purposes only" document to be generated as it has put forward, through this response, a wholly transparent picture of the facts surrounding all of these transactions and stands by them. Of course, given the litigation-tone of your letter, my client reserves all of rights under all the applicable agreements, Delaware, Texas and other applicable laws and otherwise. Please be guided accordingly.

Very truly yours,

THE CAMPBELL FIRM PLLC

By: _____
      Emily Campbell, Esq.

Enclosures