UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x

CARBONYX LICENSE & LEASE LLC, C6     :
ARDMORE VENTURES, LLC, RIVER     :
PARTNERS 2012 - CBX LLC, BHAVNA     :
PATEL, and FRANK RANGO,     :
    :
      Plaintiffs,     :
    :
        -v-     :
    :
CARBONYX INC.,     :
    :
      Defendant.     :

------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___7/1/19___

19-cv-1540 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

Before the Court is the motion of plaintiffs Carbonyx
License & Lease LLC ("CL&L"), C6 Ardmore Ventures, LLC ("C6
LLC"), River Partners 2012 - CBX LLC ("River Partners"), Bhavna
Patel ("Mrs. Patel"), and Frank Rango ("Mr. Rango") to dismiss
the counterclaims of defendant Carbonyx Inc. ("Carbonyx"), to
strike the Ninth and Tenth Affirmative Defenses in Carbonyx's
Amended Answer, and for partial judgment on the pleadings. ECF
No. 25. Carbonyx opposes. ECF Nos. 31, 32.

For the reasons below, plaintiffs' motion to dismiss
Carbonyx's counterclaims is granted, as is plaintiffs' motion to
strike Carbonyx's Ninth Affirmative Defense. Plaintiffs' motion
to strike Carbonyx's Tenth Affirmative Defense is denied,
however, as is plaintiffs' motion for partial judgment on the
pleadings.

## Background

The following factual allegations (undisputed except where indicated) are taken from plaintiffs' Amended Complaint ("Compl."), ECF Nos. 15 (unredacted version), 16 (redacted version), Carbonyx's Amended Answer ("Answer") and Counterclaim ("Countercl."), ECF Nos. 21 (unredacted version), 23 (redacted version), and any documents incorporated therein:

Defendant Carbonyx is a Delaware corporation, headquartered in Texas, that has developed a technology for producing "Cokonyx," a synthetic coke used in steel production. Compl. ¶ 9; Answer ¶ 69. Siddhartha Gaur is Carbonyx's founder and CEO. Compl. ¶ 9.

In September 2008, plaintiff CL&L and Carbonyx entered into a Royalty Stream Purchase Agreement, which was amended and restated twice in 2012. Id. ¶ 11. Under the Second Amended and Restated Royalty Stream Purchase Agreement (the "Royalty Agreement"), CL&L agreed to pay Carbonyx an initial purchase price in exchange for rights to any payments made to Carbonyx in connection with the sale or licensing of its intellectual property regarding any carbon alloy synthesis product. See Royalty Agreement §§ 1.1 (defining "Royalties"), 2.3 (setting "Initial Purchase Price"), Klein Decl., ECF No. 30, Ex. A.

The Royalty Agreement also obligated Carbonyx to provide CL&L with a copy of its annual audit report or interim unaudited financial statements at the end of each fiscal year and quarter, and to provide CL&L with other financial information that CL&L "may from time to time reasonably request." Id. § 6.1. Carbonyx was also required to keep accurate books and records and to allow CL&L to review these records "upon request . . . and reasonable notice." Id. § 6.2.

Finally, the Royalty Agreement required Carbonyx to pay or reimburse CL&L "upon demand . . . all out-of-pocket costs and expenses incurred by or on behalf of [CL&L] in connection with the continued administration of the [Royalty Agreement] and any amendments thereto, including, but not limited to, the fees and disbursements and expenses of legal counsel." Id. § 9.5(c). The Royalty Agreement likewise obligated Carbonyx to pay or reimburse CL&L for "all costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred by or on behalf of [CL&L] for the purpose of effecting collection of" royalties. Id. § 9.5(e). And the Royalty Agreement contained a broad indemnity provision that covers attorneys' fees incurred by CL&L as a result of any misrepresentation or breach by Carbonyx, or "in connection with any investigative, administrative or

judicial proceedings" that did not result from CL&L's willful misconduct or gross negligence. Id. § 9.6.

The Royalty Agreement was executed on behalf of CL&L by the late Mukesh Patel ("Mr. Patel"), whose widow is plaintiff Mrs. Patel and who was close friends with Carbonyx's CEO Gaur. On May 1, 2012, Mr. Patel – along with plaintiffs Mr. Rango and River Partners, and non-party Harmir Realty Co. LP ("Harmir") – entered into a Loan Agreement with Carbonyx, pursuant to which Mr. Patel loaned $5.75 million, Mr. Rango loaned $3.25 million, River Partners loaned $3.225 million, and Harmir loaned $1 million. Loan Agreement sched. 2.01, ECF No. 39, Ex. A. The loan had a maturity date of May 15, 2017, on which date Carbonyx was to replay all principal and interest. Id. § 2.03(c), Annex 1. The Loan Agreement also provided that each lender's rights could not be impaired without the lender's consent, id. § 6.06, and that no provision of the agreement could be amended, modified, or waived without express written consent from lenders holding more than 50% of the value of the outstanding notes, id. § 8.05, Annex 1.

In addition to its financial terms, the Loan Agreement – like the Royalty Agreement – gave the lenders the right to receive Carbonyx's annual and quarterly financial statements. Id. § 7.05. Carbonyx was also required to let the lenders view

its books and records upon reasonable notice from lenders holding more than 50% of the value of the outstanding notes. Id. § 7.06. Finally, the Loan Agreement contained an indemnity provision similar to that in the Royalty Agreement. Id. § 8.04.

Four years after the Loan Agreement was executed, Mr. Patel began making payments to Carbonyx on behalf of plaintiff C6 LLC. Compl. ¶ 35. These payments, which were made between May 13, 2016 and January 24, 2017, totaled $3.5 million. Id. The parties agree that the payments were not made as a gift or as repayment for a debt, but they dispute the nature of the rights and obligations incident to the payments. Plaintiffs allege that the payments were made pursuant to a sale/leaseback or loan agreement that was never finalized. Id. Carbonyx alleges that the payments were structured as an investment – referred to by Carbonyx as the "Revenue-Share Agreement" – in Carbonyx's Ardmore Beta Plant production facility. Countercl. ¶ 187. Carbonyx alleges that, under the terms of the Revenue-Share Agreement, Carbonyx would receive 100% of the plant's revenues until Carbonyx became profitable, then the revenues would be split 50/50 until C6 LLC recouped its $3.5 million investment, and thereafter profits would be split 70/30 between Carbonyx and C6 LLC, respectively, for the life of the plant. Id.

Turning to the instant litigation, plaintiffs allege that CL&L has not received any royalties under, or financial statements whose production is required by, the Royalty Agreement. Compl. ¶¶ 14, 15. Plaintiffs also allege that Carbonyx has repaid none of the principal and only a fraction of the interest owed under the Loan Agreement, and that Carbonyx likewise has not produced financial statements or allowed the lenders to audit and review its books and records. Id. ¶¶ 27, 32-33.

On October 31, 2018, plaintiffs sent a letter to Carbonyx demanding: (1) the production and inspection of certain documents under the Royalty Agreement, Loan Agreement, and Section 220 of the Delaware General Corporation Law; (2) immediate payment to CL&L of unpaid royalties under the Royalty Agreement; (3) immediate payment to the lenders of all amounts owed under the Loan Agreement; (4) immediate repayment of the $3.5 million advanced by Mr. Patel on behalf of C6 LLC; and (5) reimbursement of fees and expenses incurred by CL&L and the lenders in connection with their demand and enforcement of the agreements. Id. ¶ 37; see Klein Decl. Ex. B. Carbonyx responded on November 28. See Klein Decl. Ex. C. In its response, Carbonyx largely refused to comply, and it threatened to sue plaintiffs

and seek sanctions against plaintiffs' counsel. See, e.g., id. at 9, 15.

On February 19, 2019, plaintiffs filed the instant action, ECF No. 5, and on March 15 they filed their Amended Complaint, ECF Nos. 15, 16. In the Amended Complaint, plaintiffs bring claims for: (1) breach of the Royalty Agreement; (2) breach of the Loan Agreement; (3) breach of the implied covenant of good faith and fair dealing; (4) accounting; (5) unjust enrichment/quantum meruit; (6) money had and received; (7) promissory estoppel; (8) indemnification of costs and expenses (including attorneys' fees) under the Royalty Agreement; and (9) indemnification of costs and expenses (including attorneys' fees) under the Loan Agreement. See Compl. ¶¶ 43-95.

Carbonyx filed an Answer and Counterclaim on April 5, ECF Nos. 18, 19, and it filed an Amended Answer and Counterclaim on April 23, ECF Nos. 21, 23. In its Amended Answer, Carbonyx argues, inter alia, that, first, C6 LLC cannot recover its $3.5 million investment because the investment was made pursuant to an unwritten sale/leaseback or loan, and recovery is therefore barred by the Statute of Frauds (Ninth Affirmative Defense); and, second, that C6 LLC's unjust enrichment/quantum meruit claim is barred because the $3.5 million investment is governed

by the express terms of the Revenue-Share Agreement (Tenth Affirmative Defense). Answer ¶¶ 104-05.

In its Counterclaim, Carbonyx brings five causes of action: Carbonyx's First Cause of Action seeks a declaratory judgment that the lenders agreed to extinguish Carbonyx's debt under the Loan Agreement in exchange for Preferred Shares in Carbonyx. Countercl. ¶¶ 274-89. Alternatively, if it is determined that the debt was not extinguished, Carbonyx seeks the return of any Preferred Shares on the theory that the lenders would be unjustly enriched if allowed to keep them. Id. ¶¶ 291-300. In its Second Cause of Action, Carbonyx alleges that C6 LLC has breached the unwritten Revenue-Share Agreement by demanding the return of its $3.5 million investment. Id. ¶¶ 301-16. And in its Third, Fourth, and Fifth Causes of Action, Carbonyx alleges that the lenders, CL&L, and C6 LLC, respectively, have engaged in "bad faith and harassment" by sending the October demand letter and bringing this lawsuit. Id. ¶¶ 317-54.

On May 14, plaintiffs filed the instant motion, in which they seek: (1) dismissal of Carbonyx's counterclaims for failure to state a claim under Rule 12(b)(6), or in the alternative for failure to comply with Rule 8(a); (2) to strike Carbonyx's Ninth and Tenth Affirmative Defenses under Rule 12(f); and (3) partial judgment on the pleadings under Rule 12(c). Regarding their

motion under Rule 12(c), plaintiffs argue that they are entitled to judgment with respect to their Fifth Claim for Relief (unjust enrichment/quantum meruit), Sixth Claim for Relief (money had and received), and Eighth Claim for Relief (indemnification of costs and expenses under the Royalty Agreement).

## Analysis

### I.  Motion to Dismiss Counterclaims

"To survive a motion to dismiss, a complaint [or, as here, a counterclaim accompanying an answer] must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).[1] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. When adjudicating a motion to dismiss, the Court "accept[s] all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). The Court also "may consider any written instrument attached to the complaint, statements or documents incorporated

---

[1] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

into the complaint by reference, . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." Id.

**A. Declaratory Judgment and Unjust Enrichment**

Plaintiffs argue that Carbonyx's First Cause of Action should be dismissed because it will "necessarily be adjudicated as a part of the Court's consideration of Plaintiffs' claims (here, for breach of the Loan Agreement)," and because it "is merely a 'mirror image' of Plaintiffs' claims, or is contingent on the outcome of Plaintiffs' claims." Memorandum of Law in Support of Plaintiffs' Motion to Dismiss Defendant's Counterclaims and for Partial Judgment on the Pleadings 14 ("Mem."), ECF Nos. 26 (unredacted version), 29 (redacted version). As noted above, plaintiffs' claim for breach of the Loan Agreement is premised, inter alia, on Carbonyx's alleged failure to timely pay its debts. Compl. ¶ 53. Carbonyx's counterclaim, by comparison, seeks a declaration that the lenders accepted Preferred Shares in Carbonyx in exchange for cancelation of Carbonyx's obligations. Countercl. ¶¶ 274-89.

Carbonyx responds that its counterclaim is not a mirror image of, or contingent on, plaintiffs' breach of contract claim. See Memorandum of Law in Opposition to Plaintiffs' Motion to Dismiss Defendant's Counterclaims and for Partial Judgment on

the Pleadings 10-11 ("Opp."), ECF Nos. 31 (unredacted version), 32 (redacted version). Even if the Court holds that the lenders did not accept Preferred Shares in exchange for the cancelation of Carbonyx's obligations, Carbonyx argues, the Court might not determine whether the Preferred Shares are null and void. Id. at 10. And if the Preferred Shares are not determined to be null and void, Carbonyx contends that plaintiffs might not be obligated to return them. Id.

The Court agrees with plaintiffs, and it hereby dismisses Carbonyx's First Cause of Action. In deciding whether Carbonyx breached the Loan Agreement, the Court will necessarily determine whether the lenders accepted Preferred Shares in satisfaction of Carbonyx's obligations. And Carbonyx's counterclaim in the alternative – that plaintiffs will be unjustly enriched if the Court declines to address whether the Preferred Shares are null and void – is entirely contingent. Moreover, plaintiffs allege that they never received Preferred Shares, and that such shares were never properly issued. Compl. ¶ 29. Accordingly, plaintiffs would likely be estopped from later asserting Preferred Share ownership. See New Hampshire v. Maine, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because

his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.").

**B. Breach of the Revenue-Share Agreement**

Moving to the Second Cause of Action, plaintiffs give several reasons why Carbonyx fails to state a claim for breach of the Revenue-Share Agreement. Mem. 9-13. First, plaintiffs argue, the claim is barred by the Statute of Frauds, which requires that an agreement be in writing if "[b]y its terms [it] is not to be performed within one year from the making thereof." N.Y. Gen. Oblig. Law § 5-701(a)(1). Because Carbonyx's performance was tied to the distribution of profits from the Ardmore Beta Plant, and because the plant is not estimated to begin production until 2020 – three years after the Revenue-Share Agreement was allegedly entered into – plaintiffs argue that the agreement is void. Mem. 11-12.

Even if the Revenue-Share Agreement is enforceable, plaintiffs continue, Carbonyx has failed to allege a "breach" because it has alleged only that C6 LLC demanded repayment, and it has not identified any terms of the agreement that C6 LLC violated. Id. at 12. Moreover, plaintiffs argue, Carbonyx has not alleged damages because its only damages are its litigation costs and its uncertainty about its finances. Id. at 13.

Beginning with plaintiffs' first argument, the Court declines to hold at the pleading stage that the Revenue-Share Agreement is void and unenforceable under the Statute of Frauds. As relevant here, the Statute of Frauds requires an agreement to be in writing if, by its terms, it cannot be performed within one year. The Ardmore Beta Plant's estimated 2020 production start date is irrelevant to this inquiry, because that start date is not alleged to have been a term of the Revenue-Share Agreement. As far as the terms of the agreement are concerned, it was theoretically possible, albeit unlikely, for the plant to begin producing immediately.

Moreover, while it is true that "contracts of indefinite duration are deemed to be incapable of being performed within a year, and thus fall within the ambit of the Statute of Frauds," Computech Int'l, Inc. v. Compaq Computer Corp., No. 02 Civ. 2628 (RWS), 2002 WL 31398933, at *3 (S.D.N.Y. Oct. 24, 2002), the Court cannot conclude, at the pleading stage, that the Revenue-Share Agreement was of indefinite duration.[2] Instead, drawing all

_____

[2] Plaintiffs' reliance on Morgenweck v. Vision Capital Advisors, LLC, is also misguided. There, the Second Circuit held that an oral agreement was void under the Statute of Frauds where it purported to award plaintiff "some percentage of annual profits," because "[i]t is impossible that annual profits could be earned and distributed within one year." 410 F. App'x 400, 402 (2d Cir. 2011). In the instant case, Carbonyx alleges only

inferences in Carbonyx's favor, it is plausible that Carbonyx's performance under the Revenue-Share Agreement was contingent on the existence of the plant, which could have ceased within one year of the making of the agreement. See Stetson v. Pfaltzgraff Co., No. 90 Civ. 6727 (LMM), 1991 WL 275648, at *2 (S.D.N.Y. Dec. 18, 1991) ("An agreement whose performance depends upon a contingency which may or may not happen within the year is not subject to the Statute."). Although the Court may conclude after discovery that Carbonyx has failed to create a triable issue as to whether its performance was so contingent, the Court cannot make this determination at the motion to dismiss stage.

Notwithstanding the above, the Court holds that Carbonyx's Second Cause of Action must be dismissed because it fails to identify any provision of the Revenue-Share Agreement that C6 LLC breached. See Wolff v. Rare Medium, Inc., 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001) ("[A] plaintiff must identify what provisions of the contract were breached as a result of the acts at issue."). Indeed, the only provisions of the Revenue-Share Agreement that Carbonyx has identified are the "key terms" concerning C6 LLC's investment of $3.5 million in exchange for certain percentages of the Ardmore Beta Plant's profits.

---

that the Revenue-Share Agreement governed the distribution of "profits," not "annual profits." Countercl. ¶ 187.

Countercl. ¶ 187. None of these key terms precludes C6 LLC from seeking the return of its investment. Accordingly, the Court hereby grants plaintiffs' motion to dismiss Carbonyx's counterclaim for breach of the Revenue-Share Agreement.

### C. Bad Faith and Harassment

Finally, plaintiffs argue that Carbonyx's Third, Fourth, and Fifth Causes of Action should be dismissed because New York law does not recognize a cause of action for "bad faith and harassment." See Mem. 8. Carbonyx responds that its claim for "bad faith and harassment" is really a claim for breach of the implied covenant of good faith and fair dealing, and that Carbonyx "labeled it differently" "for emphasis." Opp. 16. Carbonyx argues that plaintiffs have breached this covenant in respect of the Royalty Agreement, Loan Agreement, and Revenue-Share Agreement by sending the October demand letter and filing this lawsuit. Id. at 17. Plaintiffs, in reply, argue that Carbonyx has not stated a claim for breach of the implied covenant because "Plaintiffs' actions to enforce their contractual and common law rights against Defendant cannot constitute such a breach." Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Dismiss Defendant's Counterclaims and for Partial Judgment on the Pleadings 2, ECF Nos. 36 (unredacted version), 38 (redacted version).

The Court agrees with plaintiffs, and it holds that
Carbonyx has failed to state a claim for substantially the
reasons in plaintiffs' submissions. Accordingly, Carbonyx's
Third, Fourth, and Fifth Causes of Action are hereby dismissed.[3]

## II.   Motion to Strike Affirmative Defenses

Federal Rule of Civil Procedure 12(f) "permits the court to
strike certain objectionable matter in the pleadings at a
party's request." Lipsky v. Commonwealth United Corp., 551 F.2d
887, 892 (2d Cir. 1976). Plaintiffs move to strike Carbonyx's
Ninth and Tenth Affirmative Defenses. See Answer ¶ 104 ("Should
the court determine that [the] transaction described by C6 LLC
was a sale/leaseback or loan requiring immediate repayment of
$3.5 million, C6 LLC's claims are barred by the applicable
statute of frauds."); id. ¶ 105 ("C6 LLC's claim for unjust
enrichment is barred by the application of a valid contract
relating to the transaction at issue.").

With respect to Carbonyx's Ninth Affirmative Defense,
plaintiffs argue that "C6 LLC has not asserted that there was

---

[3] Because the Court holds that each of Carbonyx's counterclaims
is properly dismissed under Rule 12(b)(6), it need not address
plaintiffs' argument that Carbonyx's counterclaims fail to
comply with Rule 8(a). The Court will note, however, that
Carbonyx's submissions have been some of the most prolix and
convoluted that the Court has seen in its 23 years. Going
forward, the Court encourages Carbonyx to be much clearer and
more concise than it has been so far.

any enforceable agreement with respect to the C6 Transfers –
whether a sale/leaseback or loan or otherwise." Mem. 20 n.3. And
with respect to Carbonyx's Tenth Affirmative Defense, plaintiffs
argue – as discussed above – that the Revenue-Share Agreement is
void under the Statute of Frauds. Id. at 22-23.

Because the Court declines to hold at the pleading stage
that the Revenue-Share Agreement is void under the Statute of
Frauds, plaintiffs' motion to strike Carbonyx's Tenth
Affirmative Defense is hereby denied. However, the Court agrees
with plaintiffs that C6 LLC has not alleged the existence of an
enforceable sale/leaseback or loan agreement. Accordingly,
plaintiffs' motion to strike Carbonyx's Ninth Affirmative
Defense is hereby granted.

## III. Motion for Partial Judgment on the Pleadings

"After the pleadings are closed – but early enough not to
delay trial – a party may move for judgment on the pleadings."
Fed. R. Civ. P. 12(c). "The standard applied to a motion for
judgment on the pleadings is the same as that used for a motion
to dismiss pursuant to [Rule 12(b)(6)]." Lefkowitz v. McGraw-
Hill Glob. Educ. Holdings, LLC, 23 F. Supp. 3d 344, 351
(S.D.N.Y. 2014). "When considering such a motion, a court should
draw all reasonable inferences in [the non-movant's] favor,
assume all well-pleaded factual allegations to be true, and

determine whether they plausibly give rise to an entitlement to relief." Id.

## A. Money Had and Received and Unjust Enrichment

Plaintiffs move for judgment on the pleadings with respect to their claim for money had and received and their claim for unjust enrichment/quantum meruit. Mem. 18-23. Although the laws of New York, Texas, and Connecticut are all potentially applicable to their claims, plaintiffs argue that there is no conflict among them. Id. at 18-19, 21. Under the laws of each state, plaintiffs contend, the elements of a claim for money had and received are: "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." Id. at 19 (quoting We Shall Overcome Found. v. Richmond Org., Inc. (TRO Inc.), 221 F. Supp. 3d 396, 411 (S.D.N.Y. 2016)). And the elements of unjust enrichment are: "that the defendant was enriched, that such enrichment was at the plaintiff's expense, and that circumstances were such that equity and good conscience require that the defendant should compensate the plaintiff." Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 403 (2d Cir. 2001); see Mem. 22.

With respect to their claim for money had and received, plaintiffs argue that Carbonyx admits receiving $3.5 million from C6 LLC and benefitting from that money. Mem. 19. Furthermore, plaintiffs argue, Carbonyx admits that the transfer was not a gift and that C6 LLC expected repayment. Id. at 20. Under such circumstances, plaintiffs contend, it would violate principles of equity and good conscience to let Carbonyx keep the $3.5 million without any obligation to return it. Id. Similarly, regarding their claim for unjust enrichment/quantum meruit, plaintiffs argue that Carbonyx was enriched by the $3.5 million investment, that the enrichment clearly occurred at C6 LLC's expense, and that equity and good conscience require the investment's return. Id. at 22.

Carbonyx responds that plaintiffs' motion should be denied because an express contract (the Revenue-Share Agreement) governs the $3.5 million investment, and because there exist factual disputes as to whether equity and good conscience require return of the money. Opp. 24. Carbonyx argues that the investment was authorized by Mr. Patel on behalf of C6 LLC, and that requiring the investment's return would harm Carbonyx. Id. at 24-25.

The Court agrees with Carbonyx, and it hereby denies plaintiffs' motion for judgment on the pleadings. As noted

19

above, the Court declines to hold at the pleading stage that the Revenue-Share Agreement is void under the Statute of Frauds. Moreover, even if the agreement were void, there remain too many unresolved factual disputes for the Court to determine at the pleading stage whether equity and good conscience require the return of C6 LLC's investment.

**B. Indemnification under the Royalty Agreement**

Finally, plaintiffs move for judgment on the pleadings with respect to CL&L's claim for indemnification of costs and expenses (including attorneys' fees) under the Royalty Agreement. Mem. 23. As relevant here, section 9.5 of the Royalty Agreement provides that:

> Carbonyx shall pay or reimburse [CL&L] upon demand: . . . (c) all out-of-pocket costs and expenses incurred by or on behalf of [CL&L] in connection with the continued administration of the [Royalty Agreement] and any amendments thereto, including but not limited to, the fees and disbursements and expenses of legal counsel for the Buyer, and any and all other expenses and charges; . . . [and] (e) all costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred by or on behalf of [CL&L] for the purpose of effecting collection of the [royalties] or any portion thereof . . . .

According to plaintiffs, there is no dispute that they demanded in their October letter that Carbonyx reimburse CL&L's costs and expenses. Mem. 24. Moreover, plaintiffs continue, the October letter and the instant lawsuit clearly had "the purpose

of effecting collection of the" royalties that they believe they are owed. Id. Plaintiffs also contend, based on the broad language of section 9.5, that the "requirement that Carbonyx reimburse CL&L 'upon demand' means that CL&L is entitled to advancement of its costs and expenses." Id. And plaintiffs argue that, "since '[t]he right to advancement ordinarily is not dependent upon a determination that the party in question ultimately will prevail or be entitled to indemnification,' the fact that Carbonyx claims there are no Royalties to collect is immaterial and does not contradict CL&L's right to advancement." Id. at 25 (citation omitted) (quoting Emerging Europe Growth Fund, L.P. v. Figlus, C.A. No. 7936-VCP, 2013 WL 1250836, at *4 (Del. Ch. Mar. 28, 2013)).

Carbonyx's response is less than clear, see Opp. 20-22, but it does gesture at one argument that the Court finds persuasive: plaintiffs have failed to show, at least at the pleading stage, that CL&L and Carbonyx intended to indemnify costs and expenses incurred in litigation between them. The Royalty Agreement is governed by Delaware law, see Royalty Agreement § 9.8(a), and under Delaware law: "Standard indemnity clauses are not presumed to apply to first-party claims. Otherwise, a typical indemnification provision would swallow the American Rule. In order for an indemnification provision to cover fee-shifting

among parties, the contract must specifically state that requirement." <u>Deere & Co. v. Exelon Generation Acquisitions, LLC</u>, C.A. No. N13C-07-330 MMJ CCLD, 2016 WL 6879525, at *1 (Del. Super. Ct. Nov. 22, 2016). While plaintiffs may be able to prove later in this litigation that the Royalty Agreement "specifically state[s] that" CL&L and Carbonyx intended to cover first-party claims, the Court cannot reach this conclusion at the pleading stage after drawing all reasonable inferences in Carbonyx's favor. Accordingly, plaintiffs' motion for judgment on the pleadings is hereby denied.

## Conclusion

In sum, plaintiffs' motion to dismiss Carbonyx's counterclaims is granted, as is plaintiffs' motion to strike Carbonyx's Ninth Affirmative Defense. Plaintiffs' motion to strike Carbonyx's Tenth Affirmative Defense is denied, however, as is plaintiffs' motion for partial judgment on the pleadings.

The Clerk is directed to close to entry at docket number 25.

SO ORDERED.

Dated: New York, NY

     July 1, 2019

_____

JED S. RAKOFF, U.S.D.J.